[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14426

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 27, 2011
JOHN LEY
CLERK

D. C. Docket No.  6:09-cv-01850-MSS,
BKCY No. 6:02-bk-05591-ABB

IN RE:

MIGUEL A. DIAZ,

Debtor,

_____

STATE OF FLORIDA DEPT OF REVENUE,

Plaintiff - Appellant,

versus

MIGUEL A. DIAZ,
a.k.a. Miguel A. Diaz-Collado,

Defendant - Appellee.

_____

No. 10-14475

_____

D. C. Docket No.  6:09-cv-01850-MSS,
BKCY No. 6:02-bk-05591-ABB

IN RE:

MIGUEL A. DIAZ,

Debtor,

_____

COMMONWEALTH OF VIRGINIA DEPT OF SOCIAL SERVICES,

Plaintiff - Appellant,

versus

MIGUEL A. DIAZ,
also known as
Miguel A. Diaz-Collado,

Defendant -Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(July 27, 2011)

Before DUBINA, Chief Judge, HILL and EBEL,[*] Circuit Judges.

EBEL, Circuit Judge:

The Florida Department of Revenue ("Florida DOR") and the Virginia

Department of Social Services ("Virginia DSS") appeal the district court's

decision affirming an order of the bankruptcy court holding the agencies in

_____

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

contempt and awarding the debtor, Miguel Diaz, compensatory and punitive damages for the agencies' alleged violations of the automatic stay and discharge injunction. Exercising jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291, we conclude that state sovereign immunity shields the Florida DOR and Virginia DSS from Diaz's claims for violations of the automatic stay. Furthermore, although sovereign immunity does not bar Diaz's claims for violations of the discharge injunction, we conclude that neither the Florida DOR nor the Virginia DSS violated the discharge injunction. Accordingly, we REVERSE the judgment of the district court and REMAND with instructions to vacate the bankruptcy court's order and dismiss the action.

## BACKGROUND

In May 1986, a Virginia state court ordered Debtor-Appellee Miguel A. Diaz to pay child support to his ex-wife, Maribel Diaz-Bieberach. But Diaz quickly defaulted on his support obligation, and, in November 1989, the Virginia court entered a judgment in favor of Diaz-Bieberach for $29,500 in support arrearages. The court's new order required Diaz to pay $200 per month toward the arrearages and reaffirmed his continuing obligation to pay $500 per month for child support. Diaz subsequently moved from Virginia to Florida.

3

After Diaz's relocation, he failed to make support payments in accordance with the Virginia court's order. Consequently, the Virginia DSS, acting on behalf of Diaz-Bieberach, requested the Florida DOR's assistance in enforcing the order.[1] In March 1996, a Florida state court ordered that an account be established for the receipt and disbursement of the support payments ordered by the Virginia court. The Florida court also entered an income-deduction order against Diaz. Nevertheless, Diaz continued to default on his support obligation.

On May 24, 2002, Diaz filed for Chapter 13 bankruptcy protection, listing the Florida DOR as a priority unsecured creditor. Later that year, the Florida DOR filed a proof of claim with bankruptcy court in the amount of $67,047.45 for past-due child support. This dollar figure represented principal and roughly $20,000 in accrued pre-petition interest. But the monthly statement of account that the Florida DOR submitted in support of its claim did not include interest; instead, the statement of account indicated that the total amount of overdue child-support was $47,746.49.[2] Diaz objected to the Florida DOR's claim on the basis of the supporting monthly account statement, arguing that the statement demonstrated

---

[1]The Florida DOR is the Florida state agency charged with enforcing and collecting child-support obligations established in another state. See Fla. Stat. § 409.2557.

[2]The account statement contained the following provision regarding interest: "DOR court cost[s] and interest are not included on statement." (Doc. 2, at Ex. A (emphasis added).)

4

that he owed only $47,746.49 in support arrearages. For reasons that are not revealed by the record, the Florida DOR did not respond to Diaz's objection within thirty days. Consequently, the bankruptcy court deemed the objection unopposed and ordered the Florida DOR's claim reduced to $47,746.49. The Florida DOR's allowed claim thus covered only unpaid principal and not interest.

On January 24, 2003, Diaz filed an amended Chapter 13 plan providing for payment in full of the Florida DOR's allowed claim over a period of fifty-eight months. Neither the Florida DOR nor any other creditor objected to the plan, so the bankruptcy court entered an order confirming the plan on March 27, 2003. Diaz then began making payments in accordance with the plan.

During Diaz's bankruptcy, the Florida DOR mailed Diaz two separate notices regarding unpaid child support. On May 8, 2004, the Florida DOR issued a "Notice to Report to Consumer Reporting Agencies." This notice advised Diaz that he owed overdue support in the amount of $1,699.40 and that this delinquency would be reported to consumer reporting agencies unless Diaz paid the arrearages or requested an administrative hearing to contest the Florida DOR's action. On September 23, 2004, the Florida DOR issued a "Notice of Intent to Suspend Driver License/Vehicle Registration(s)," which informed Diaz that he owed $2,669.40 in past-due child support and that the department was authorized to request the

5

Florida Department of Highway Safety and Motor Vehicles ("Florida DHSMV") to suspend his driver's license and motor-vehicle registration. The notice stated that the Florida DOR would make such a request unless Diaz (1) paid the delinquency in full, (2) scheduled a payment plan with the Florida DOR, or (3) contested the suspension action by filing a petition in state court. After each of these notices, Diaz's attorney contacted the Florida DOR, informed the department of Diaz's bankruptcy, and requested that the department cease its collection efforts. The Florida DOR took no further action while the bankruptcy was pending.

Diaz completed all payments under his Chapter 13 plan early, and on November 29, 2005, the bankruptcy court entered an order granting Diaz a discharge pursuant to the general discharge provision of Chapter 13. The discharge order explained that a Chapter 13 discharge extinguishes the debtor's legal obligation to pay any debt that is discharged. It further explained that "[m]ost, but not all, types of debts are discharged if the debt is provided for by the chapter 13 plan or is disallowed by the court." (Doc. 2-9, at 2.) Finally, it listed common types of debts that are not discharged in a Chapter 13 case, including "[d]ebts that are in the nature of alimony, maintenance, or support." (Id.)

6

The bankruptcy court formally closed the case on April 11, 2006. Diaz

received no communications from either the Florida DOR or the Virginia DSS for

a year and a half after that date. Between October 2007 and May 2009, however,

the Florida DOR and Virginia DSS initiated a series of collection activities against

Diaz in an effort to recover both the pre-petition interest on Diaz's support

obligation, which the bankruptcy court had disallowed, and the interest that

accrued post-petition while Diaz was paying down the principal through his

Chapter 13 plan.[3] Specifically, the Florida DOR issued three collection letters,

caused a Florida state court to enter an income-deduction order against Diaz, and

caused the Florida DHSMV to suspend Diaz's driver's license for forty-nine days.[4]

In addition, the Virginia DSS sent Diaz two collection letters and caused the U.S.

Treasury Department to intercept Diaz's income-tax refunds in 2008 and 2009.

On December 4, 2008, Diaz filed a motion for contempt and sanctions in the

bankruptcy court. In the motion, Diaz alleged that the Florida DOR violated the

---

[3]According to Virginia DSS records, Diaz owed $27,119 in pre- and post-petition interest as of October 30, 2007.

[4]The Florida DOR contends that the bankruptcy court erroneously found that the Florida DHSMV suspended Diaz's license for forty-nine days. According to the Florida DOR, the record shows that the Florida DHSMV scheduled Diaz's license for suspension but then cancelled the suspension before it took effect. Because we conclude that the Florida DOR did not violate the discharge injunction even if it did cause Diaz's license to be suspended, we need not decide whether this factual finding by the bankruptcy court was error.

automatic stay of 11 U.S.C. § 362[5] by sending two collection notices while the bankruptcy was pending and that both the Florida DOR and Virginia DSS repeatedly violated the discharge injunction of 11 U.S.C. § 524 by trying to collect past-due child support after the discharge. He sought compensatory damages, including costs and attorney's fees, and punitive damages.

The bankruptcy court granted Diaz's motion and held the agencies in contempt on September 30, 2009. As an initial matter, the bankruptcy court rejected the Florida DOR's and Virginia DSS's argument that state sovereign immunity shielded them from Diaz's claims. Turning to the merits of those claims, the bankruptcy court determined that both agencies had wilfully violated the automatic stay, the discharge injunction, and numerous court orders. As relief, the bankruptcy court awarded Diaz $42,622.00 in actual damages and $25,000.00 in punitive damages. On appeal, the district court affirmed the bankruptcy court's judgment.

The Florida DOR and Virginia DSS now seek review in this Court. We begin our analysis with the threshold issue of sovereign immunity.

_____

[5]Unless otherwise specified, all references to the Bankruptcy Code (Title 11 of the U.S. Code) refer to the version in effect when Diaz filed for bankruptcy in May 2002. Congress enacted substantial amendments to the Bankruptcy Code in 2005, see Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (2005), but those amendments do not apply in the present case. See In re Globe Mfg. Corp., 567 F.3d 1291, 1297 n.4 (11th Cir. 2009).

8

## DISCUSSION

### I. Standard of Review

"We review the district court's decision to affirm the bankruptcy court de novo, which allows us to assess the bankruptcy court's judgment anew, employing the same standard of review the district court itself used." In re Globe Mfg. Corp., 567 F.3d 1291, 1296 (11th Cir. 2009). Thus, we review the bankruptcy court's grant of Diaz's motion for contempt and sanctions for an abuse of discretion. See Jove Eng'g, Inc. v. IRS, 92 F.3d 1539, 1545–46 (11th Cir. 1996). A bankruptcy judge abuses his discretion if he commits an error of law or relies on factual findings that are clearly erroneous. See In re Celotex Corp., 227 F.3d 1336,1338 (11th Cir. 2000).

### II. State Sovereign Immunity

#### A. Current Law Pertaining to State Sovereign Immunity in Bankruptcy Proceedings

Generally speaking, the doctrine of state sovereign immunity precludes a federal court from entertaining a private person's suit against a state. See Va. Office for Protection & Advocacy v. Stewart, 131 S. Ct. 1632, 1637–38 (2011). State sovereign immunity is not absolute, however, and this case requires us to consider three different theories of how a bankruptcy court might acquire in

9

personam jurisdiction over a state that would otherwise be immune to suit. Before addressing whether any of these theories authorize Diaz's suit against the Florida DOR and Virginia DSS, we pause here briefly to identify these theories and to discuss their evolution and current vitality.

The first and best settled theory is the "litigation waiver" theory. Under this theory, which is familiar in many areas of the law, a state waives its sovereign immunity to the extent it voluntarily invokes the jurisdiction of the federal courts. See Lapides v. Bd. of Regents, 535 U.S. 613, 618–19 (2002). In the bankruptcy context, this means that when a state "invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance," the state "waives any immunity which it otherwise might have had respecting the adjudication of the claim." Gardner v. New Jersey, 329 U.S. 565, 573–74 (1947); see also Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 681 n.3 (1999) (explaining that Gardner "stands for the unremarkable proposition that a State waives its sovereign immunity by voluntarily invoking the jurisdiction of the federal courts"). The "litigation waiver" theory as applied to bankruptcy proceedings has evolved little since Gardner. Thus, although we will address its applicability to the present case later, see infra Part II.B.1.b, we need not discuss the theory further here.

The second theory, which is also familiar in areas of the law other than bankruptcy, is "congressional abrogation." Under this theory, Congress may abrogate state sovereign immunity if it (1) "unequivocally expresse[s] its intent to abrogate" in the text of a statute and (2) acts "pursuant to a valid exercise of power."[6] Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55 (1996) (internal quotation marks omitted). In 1994, Congress passed § 106(a) of the Bankruptcy Code in an effort to effect a limited abrogation of the states' sovereign immunity with respect to claims brought under certain sections of the Code, including the sections at issue in the present case. Section 106(a) provides, in relevant part, as follows:

> (a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:
>
>> (1) Sections 105 [bankruptcy court's civil-contempt power], . . . 362 [automatic stay], . . . [and] 524 [discharge injunction] . . . of this title.

11 U.S.C. § 106(a)(1).

---

[6]The Supreme Court has "recognized that Congress may abrogate a State's immunity when it acts under § 5 of the Fourteenth Amendment, but not when it acts under its original Article I authority to regulate commerce." Stewart, 131 S. Ct. at 1638 n.2 (citation omitted).

Section 106(a) initially appeared to provide a basis for the "congressional abrogation" theory in bankruptcy proceedings. In 2004, however, this Court held that § 106(a) was unconstitutional. In re Crow, 394 F.3d 918, 924 (11th Cir. 2004) (per curiam). We reasoned that Congress lacked the power to abrogate state sovereign immunity under the Bankruptcy Clause of Article I of the U.S. Constitution and that § 106(a) was not validly enacted pursuant to Section 5 of the Fourteenth Amendment. Id. Thus, we concluded that a Chapter 7 debtor's complaint seeking damages against two state agencies for allegedly violating the discharge injunction should have been dismissed on sovereign-immunity grounds. Id.

Not long after our decision in In re Crow, the Supreme Court granted certiorari in Central Virginia Community College v. Katz, 546 U.S. 356 (2006), to resolve "whether Congress' attempt to abrogate state sovereign immunity in 11 U.S.C. § 106(a) is valid." Id. at 361 (footnote omitted). In Katz, a bankruptcy trustee commenced an in personam proceeding against state institutions of higher education in order to avoid and recover alleged preferential transfers made by the debtor to the institutions while the debtor was insolvent. Id. at 360. The institutions raised state sovereign immunity as a defense. Id. Although the Court's answer to the question whether § 106(a) validly abrogated the institutions'

12

immunity would have conclusively determined the viability of the "congressional abrogation" theory in bankruptcy, the Court ultimately resolved the case without reaching that question. See id. at 359, 362, 377–79. Instead, the Court recognized a new theory, which we will refer to as "consent by ratification."

The "consent by ratification" theory is predicated on the states' decision when joining the Union to ratify the Bankruptcy Clause, which empowers Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. The Court in Katz explained that "[b]ankruptcy jurisdiction, as understood today and at the time of the framing, is principally in rem jurisdiction." 546 U.S. at 369. Nevertheless, the Court continued, "[t]he Framers would have understood that laws 'on the subject of Bankruptcies' included laws providing, in certain limited respects, far more than simple adjudications of rights in the res." Id. at 370. "More generally," the Court stated, "courts adjudicating disputes concerning bankrupts' estates historically have had the power to issue ancillary orders enforcing their in rem adjudications." Id. Therefore, the Court concluded that when the states ratified the Bankruptcy Clause, they "acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the in rem jurisdiction of the bankruptcy courts." Id. at 378; see also id. at 373 ("Insofar as

13

orders ancillary to the bankruptcy courts' in rem jurisdiction, like orders directing turnover of preferential transfers, implicate States' sovereign immunity from suit, the States agreed in the plan of the Convention not to assert that immunity.").

The applicability of the "consent by ratification" theory in a given case thus turns on whether the proceedings against the state qualify as "necessary to effectuate the in rem jurisdiction of the bankruptcy courts." Id. at 378. The Katz Court did not endeavor to define the range of proceedings that satisfy this standard. The Court's decision, however, does establish some parameters. To begin with, the Court provided guidance by setting forth the three critical in rem functions of bankruptcy courts: "[1] the exercise of exclusive jurisdiction over all of the debtor's property, [2] the equitable distribution of that property among the debtor's creditors, and [3] the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." Id. at 363–64. At a minimum, then, a proceeding must directly relate to one or more of these functions in order to meet the "necessary to effectuate" standard. The Court also warned that not "every law labeled a 'bankruptcy' law could, consistent with the Bankruptcy Clause, properly impinge upon state sovereign immunity." Id. at 378 n.15. In context, we interpret this to mean that some proceedings, although they may arise under the Bankruptcy Code, nevertheless lack a meaningful nexus

14

to the bankruptcy courts' in rem jurisdiction and thus do not fall within the scope of the states' consent to suit. These guidelines provide a useful starting point for courts tasked with giving meaning to the "necessary to effectuate" standard and further refining the "consent by ratification" theory.

Having discussed the three different theories of how a bankruptcy court might obtain in personam jurisdiction over a state, we are almost ready to turn to the specifics of this case. Before moving on, however, we must make one more important point about Katz. Although Katz did not directly address the constitutionality of § 106(a) or the viability of the "congressional abrogation" theory, the Katz Court made clear that the Bankruptcy Clause—and not "any statement Congress ha[s] made on the subject of state sovereign immunity" in § 106(a)—represents the source of any "subordination" of state sovereign immunity in bankruptcy proceedings. Id. at 378; see also id. at 379 ("[T]he relevant 'abrogation' is the one effected in the plan of the Convention, not by statute."). Accordingly, the "consent by ratification" inquiry of Katz precedes and obviates the need for the "congressional abrogation" inquiry.[7] See id. at 362 (recognizing that because the state institutions consented to suit by ratifying the Bankruptcy

---

[7]For this reason, we need not decide whether our holding in In re Crow regarding the unconstitutionality of § 106(a) remains good law after Katz.

Clause, "the enactment of [§ 106(a)] was not necessary to authorize the Bankruptcy Court's jurisdiction over these preference avoidance proceedings"); id. at 379 ("The relevant question is not whether Congress has 'abrogated' States' immunity in proceedings to recover preferential transfers. The question, rather, is whether Congress' determination that States should be amenable to such proceedings is within the scope of its power to enact 'Laws on the subject of Bankruptcies.'" (footnote and citation omitted)). After Katz, then, courts faced with state-sovereign-immunity questions in bankruptcy proceedings should limit their focus to the "litigation waiver" theory and the "consent by ratification" theory.

We take that approach here and now turn to the application of those two theories to the contempt proceedings in this case, addressing first whether the Florida DOR and Virginia DSS are precluded from asserting sovereign immunity as a defense to Diaz's claims for violations of the automatic stay pursuant to the "consent by ratification" theory of Katz.[8]

**B.    Application**

---

[8]Although Diaz alleged stay violations and discharge-injunction violations in a single contempt motion, we believe that Diaz's motion gave rise to two distinct "proceedings" for sovereign-immunity purposes—one for the alleged violations of the automatic stay and one for the alleged violations of the discharge injunction. Thus, we consider these proceedings separately.

16

1. **Contempt Proceedings for Violations of the Automatic Stay**

   a. **"Consent by Ratification"**

As explained above, the exercise of jurisdiction over the bankruptcy estate and the equitable distribution of the estate's property among the debtor's creditors are two of the three core in rem functions of a bankruptcy court. Katz, 546 U.S. at 363–64. The automatic stay is a fundamental procedural mechanism in bankruptcy that allows the court to carry out both of these functions. Specifically, the stay facilitates the orderly administration and distribution of the estate by "protect[ing] the bankrupt's estate from being eaten away by creditors' lawsuits and seizures of property before the trustee has had a chance to marshal the estate's assets and distribute them equitably among the creditors." Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n, 892 F.2d 575, 577 (7th Cir. 1989).

Ordinarily, an adversary action arising out of a creditor's violations of the automatic stay forces the creditor to honor the automatic stay and thereby assists the bankruptcy court in carrying out its in rem functions. That holds true even where the action takes the form of a motion seeking contempt and sanctions. Although these kinds of actions "may resemble money damage lawsuits in form, it is their function that is critical, and their function is to facilitate the in rem proceedings that form the foundation of bankruptcy." In re Omine, 485 F.3d 1305,

17

1313 (11th Cir. 2007), withdrawn pursuant to settlement, No. 06-11655-II, 2007 WL 6813797 (11th Cir. June 26, 2007) (unpublished);[9] see also In re Burke, 146 F.3d 1313, 1319 (11th Cir. 1998) (characterizing the debtors' action brought before the discharge for damages caused by violations of the automatic stay as an action to enforce the automatic stay).

As a result, we have no difficulty concluding that contempt motions alleging that a creditor has violated the automatic stay generally qualify as "proceedings necessary to effectuate the in rem jurisdiction of the bankruptcy courts." Katz, 546 U.S. at 378. Therefore, the "consent by ratification" theory will generally allow a bankruptcy court to exercise jurisdiction over a state in such proceedings. We emphasize the word "generally," however, because this case presents a rare exception to the rule.

Here, the Florida DOR and Virginia DSS allegedly violated the automatic stay in 2004. But it was not until more than four years later that Diaz filed his contempt motion. By that time, the bankruptcy court had distributed the estate according to the Chapter 13 plan and entered a discharge order, which replaced the automatic stay with the discharge injunction. Thus, the automatic stay had already

_____

[9]We recognize that the In re Omine decision has been withdrawn and is not binding precedent. Nevertheless, we may rely on statements in that opinion for their persuasive value. See Friends of Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1218 (11th Cir. 2009).

accomplished its purpose of preserving the assets of the estate by the time that Diaz brought this suit, and it was no longer necessary or even operative to assist the bankruptcy court in exercising its in rem jurisdiction. For that reason, to the extent that Diaz's motion seeks contempt and sanctions for alleged violations of the automatic stay, it was filed too late to be considered essential to any in rem functions of the bankruptcy court. The nexus between the motion and the bankruptcy court's in rem jurisdiction is thus too remote to satisfy Katz's "necessary to effectuate" standard.

Because we conclude that the portion of Diaz's motion that alleges violations of the automatic stay does not fall within the class of "proceedings necessary to effectuate the in rem jurisdiction of the bankruptcy courts," id., we hold that the "consent by ratification" theory does not provide a basis for the bankruptcy court's exercise of jurisdiction over the Florida DOR and Virginia DSS in the contempt proceedings for violations of the automatic stay. Therefore, we must next consider whether the Florida DOR and Virginia DSS waived their sovereign immunity to these proceedings under the "litigation waiver" theory.

### b. "Litigation Waiver"[10]

---

[10]We note that our waiver analysis is based on constitutional principles and not on 11 U.S.C. § 106(b), in which Congress attempted to define the scope of the waiver effected by a state's filing of a proof of claim. See In re Burke, 146 F.3d at 1317 n.8.

When the Florida DOR filed a proof of claim in Diaz's bankruptcy case, it "waive[d] any immunity which it otherwise might have had respecting the adjudication of the claim." Gardner, 329 U.S. at 574. This Court has had only one prior opportunity to address the scope of the "litigation waiver" recognized in Gardner. In In re Burke, we held that the waiver extends to (1) actions seeking damages for automatic-stay violations filed while the automatic stay is in effect and (2) actions seeking damages for violations of the discharge injunction. See 146 F.3d at 1319. In re Burke does not resolve the question before us here, which is whether the "waiver respecting the adjudication of the claim" encompasses a contempt motion that alleges violations of the automatic stay but was filed after the discharge in a Chapter 13 case.

In our view, the language "respecting the adjudication of the claim" functions as an important limitation on the scope of the "litigation waiver" in bankruptcy. A state that files a proof of claim in a bankruptcy case does not thereby subject itself to any and all lawsuits that in any way might relate to the bankruptcy. Instead, an adversary action against the state must bear a direct relationship to the bankruptcy court's adjudication of the state's claim. In a Chapter 13 case, an action meets this standard in only two situations. First, an action qualifies if it is initiated before the discharge and targets the state's failure

20

to abide by any of the procedures and rules that exist to facilitate the bankruptcy court's adjudication of the claim, including, <u>inter alia</u>, the automatic stay. Second, an action qualifies if it is initiated <u>after</u> the discharge and targets the state's failure to honor the discharge injunction, the procedural mechanism that exists post-discharge to protect the bankruptcy court's adjudication of the claim.

To the extent that Diaz's contempt motion alleges violations of the automatic stay, it does not fit within either of these two scenarios. Diaz filed his motion long after the entry of a discharge order and the dissolution of the stay. At that point, any action regarding stay violations was insufficiently related to the bankruptcy court's adjudication of the Florida DOR's claim. Accordingly, we hold that the Florida DOR did not waive sovereign immunity to the portion of Diaz's motion that alleges violations of the automatic stay when it filed a proof of claim.[11]

Because neither the "consent by ratification" theory nor the "litigation waiver" theory allows Diaz to overcome the Florida DOR's and Virginia DSS's sovereign-immunity defense, we hold that the bankruptcy court lacked jurisdiction to adjudicate Diaz's contempt motion to the extent that the motion alleges

---

[11]In light of this holding, we need not decide whether the Florida DOR's filing of a proof of claim could waive the sovereign immunity of the Virginia DSS.

violations of the automatic stay.[12]  We now turn to the issue of whether state

sovereign immunity bars Diaz's claims for violations of the discharge injunction.

### 2. Contempt Proceedings for Violations of the Discharge Injunction

#### a. "Consent by Ratification"

As we pointed out above, the discharge is one of the three fundamental in

rem functions of the bankruptcy courts.  Katz, 546 U.S. at 363–64.  A bankruptcy

court's discharge order provides the debtor with a financial "fresh start" by

"releas[ing] [the] debtor from personal liability with respect to any discharged

debt."  Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 447 (2004).  The

discharge injunction that arises upon the entry of a discharge order is perhaps the

most important feature of the discharge.  That injunction helps to ensure that the

debtor's "fresh start" is realized by prohibiting creditors from attempting to collect

discharged debts.  See In re Jet Fla. Sys., Inc., 883 F.2d 970, 972 (11th Cir. 1989).

We recognized in Part II.B.1.a that the function of a particular type of

proceeding is critical to the determination of whether that proceeding qualifies as

necessary to effectuate the bankruptcy courts' in rem jurisdiction.  See Katz, 546

U.S. at 378.  An adversary action arising out of a creditor's alleged violations of

---

[12]As a result, we do not reach the question whether the Florida DOR and Virginia DSS actually violated the automatic stay.

22

the discharge injunction forces the creditor to honor the discharge and thereby protects the bankruptcy court's in rem jurisdiction. This is so even when the action takes the form of a money-damages lawsuit. See In re Slayton, 409 B.R. 897, 903–04 (Bankr. N.D. Ill. 2009) ("[D]amages[] and attorneys' fees, though seemingly in personam remedies, are ancillary to [an] . . . in rem proceeding because those remedies serve as mechanism for enforcement of the discharge."); see also In re Burke, 146 F.3d at 1319 (characterizing the debtors' action seeking damages for violations of the discharge injunction as an action to enforce the discharge injunction). We thus conclude that motions seeking contempt and sanctions for alleged violations of the discharge injunction meet the Katz "necessary to effectuate" standard. Consequently, pursuant to the "consent by ratification" theory, the bankruptcy court had jurisdiction to entertain the portion of Diaz's motion that alleges violations of the discharge injunction notwithstanding the Florida DOR's and Virginia DSS's assertion of sovereign immunity.[13]

We now proceed to address the principal merits issue that remains after our sovereign-immunity rulings—whether the Florida DOR and Virginia DSS violated

---

[13]Given this holding, we need not address whether the "litigation waiver" theory also provides a basis for jurisdiction.

the discharge injunction by attempting to collect child-support from Diaz after the discharge.

## III. Violations of the Discharge Injunction

Pursuant to § 524 of the Bankruptcy Code, a discharge under Chapter 13 "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [discharged] debt as a personal liability of the debtor."  11 U.S.C. § 524(a)(2).  Significantly, the discharge injunction "prohibits collection only with respect to dischargeable debts and does not apply to nondischargeable debts."  United States v. White, 466 F.3d 1241, 1246 (11th Cir. 2006).  As a result, once a discharge has been granted, holders of nondischargeable debts generally may attempt to collect from the debtor personally for such debts.  See id. at 1245–46.

The bankruptcy court and the district court in this case concluded that the Florida DOR's and Virginia DSS's post-discharge attempts to collect the unpaid pre- and post-petition interest on Diaz's child-support obligation violated the discharge injunction.  Although the agencies argued that child-support debts are nondischargeable and that they could not have violated the discharge injunction by trying to collect a nondischargeable debt, the bankruptcy court reasoned that any

24

amount of the debt above the amount of the Florida DOR's allowed claim was

discharged:

> A child support debt is nondischargeable pursuant to 11 U.S.C. Section 523(a)(5), but Section 523(a)(5) does not insulate Respondents from the discharge injunction. Respondents submitted to the claim adjudication process by filing [a] proof[] of claim pursuant to 11 U.S.C. Section 501(a). Their claim was fixed at $47,746.49 pursuant to 11 U.S.C. Section 502(a). Their allowed claim was provided for in the Plan and was fully paid and satisfied. The debt was discharged pursuant to 11 U.S.C. Section 1328(a).

(Doc. 7-3, at 48; see also id. at 25 ("Respondents received and accepted payment

in full of their allowed claim of $47,746.49 through Plan disbursements. Any

purported delinquency owed to Respondents over and above the allowed claim

was discharged.").

Further, the bankruptcy court determined that collateral estoppel and res

judicata precluded the agencies from arguing that Diaz owed a child-support debt

greater than $47,746.49 or that any deficiency survived the discharge. The court

reasoned that the amount of the debt was conclusively adjudicated during the

claims-allowance process and reaffirmed in subsequent orders that incorporated

the court's resolution of Diaz's claim objection, including the order confirming

Diaz's Chapter 13 plan.

Unlike the bankruptcy court, the district court determined that "the

bankruptcy court did not discharge [Diaz's] child support obligations in the

Chapter 13 bankruptcy proceeding." (Doc. 28, at 17 (emphasis added).) Nevertheless, relying on the bankruptcy court's preclusion rationale, the district court still concluded that the Florida DOR and Virginia DSS violated the discharge injunction. The court referred to the agencies' "argument regarding the nondischargeability of child support [as] nothing more than a red herring" and framed the "real issue" as "whether Appellants are barred from re-litigating matters already decided by the bankruptcy court under res judicata or collateral estoppels [sic], to wit, the determination of the <u>amount</u> of the child support claim." (<u>Id.</u>)

On appeal, the agencies argue that they could not have violated the discharge injunction because child-support obligations are never dischargeable in a Chapter 13 bankruptcy. They further contend that res judicata and collateral estoppel do not apply because neither the amount nor the dischargeability of the child-support debt was litigated when the court resolved Diaz's objection to the Florida DOR's proof of claim. We agree with the Florida DOR and Virginia DSS. The conclusions reached by the bankruptcy court and district court contravene the plain language of the Chapter 13 discharge provision and conflict with Congress's clear intent to insulate child-support creditors from the discharge injunction after Chapter 13 bankruptcy proceedings.

26

## A.  Nondischargeability of Child-Support Debts

Although "[a] discharge under Chapter 13 is broader than the discharge received in any other chapter[,] Chapter 13 nevertheless restricts or prohibits entirely the discharge of certain types of debts."  United Student Aid Funds, Inc. v. Espinosa, 130 S. Ct. 1367, 1376 (2010) (internal citation and quotation marks omitted).  Section 1328 of the Bankruptcy Code governs the scope of the discharge in a Chapter 13 case.  That section provides, in pertinent part, as follows:

> (a) As soon as practicable after completion by the debtor of all payments under the plan, . . . the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt--
>
> . . . .
>
> (2) of the kind specified in . . . paragraph (5) . . . of section 523(a) of this title[.]

11 U.S.C. § 1328(a)(2) (emphasis added).  Thus, § 1328 indicates that a debt of the kind specified in § 523(a)(5) is not discharged by the bankruptcy court's discharge order in a Chapter 13 case.  Section 523(a)(5) specifically lists a debt for child support as an exception to discharge.  Consequently, as the Supreme Court

27

recently observed, a child-support debt is "<u>not</u> dischargeable under <u>any</u> circumstances" in Chapter 13 proceedings.[14]  <u>Espinosa</u>, 130 S. Ct. at 1379 n.10.

In light of the foregoing, we easily conclude that the bankruptcy court's discharge order did not discharge Diaz's child-support obligation.  Therefore, the Florida DOR and Virginia DSS could not have violated the <u>discharge injunction</u> by pursuing Diaz for child support after the discharge, and an award of sanctions for violations of the discharge injunction cannot stand.

The bankruptcy court reached a contrary conclusion because it operated under the assumption that the disallowed portion of the Florida DOR's claim was necessarily discharged.  But "disallowance of a claim and nondischargeability are separate issues."  <u>In re Zich</u>, 291 B.R. 883, 886 (Bankr. M.D. Ga. 2003).  Although a creditor whose claim is disallowed may not collect from the bankruptcy estate, "disallowance of a claim does not necessarily discharge [the

---

[14]Although it is clear that pre-petition interest and principal are part of a nondischargeable child-support obligation, the Eleventh Circuit has not yet considered whether interest on a child-support obligation that accrues post-petition is also nondischargeable.  In <u>In re Burns</u>, however, we held that "post-petition interest on a nondischargeable tax debt is nondischargeable."  887 F.2d 1541, 1543 (11th Cir. 1989).  We see no basis on which to distinguish post-petition interest on a tax debt and post-petition interest on a child-support debt.  Thus, we agree with the Ninth Circuit that "post-petition interest, as an integral part of the nondischargeable child support obligation, is also nondischargeable and may be collected personally against the debtor" after the discharge.  <u>In re Foster</u>, 319 F.3d 495, 498 (9th Cir. 2003); <u>see also</u> <u>Bruning v. United States</u>, 376 U.S. 358, 360 (1964) ("[O]ne would assume that Congress, in providing that a certain type of debt should survive bankruptcy proceedings as a personal liability of the debtor, intended personal liability to continue as to the interest on that debt as well as to its principal amount.").

28

underlying] debt" and eliminate the debtor's personal liability outside of bankruptcy. In re Cruz, 277 B.R. 793, 795 (Bankr. M.D. Ga. 2000); see also In re Bell, 236 B.R. 426, 430 (N.D. Ala. 1999) ("Claim allowance and debt liability are different concepts."). As relevant to the present case, the Code provision governing a Chapter 13 discharge compels the conclusion that a child-support debt is not discharged regardless of whether the debt is provided for by the plan or disallowed. 11 U.S.C. § 1328(a)(2). Thus, if a creditor holds a child-support debt, then whether the bankruptcy court disallows all, part, or even none of that creditor's claim has no bearing on whether any portion of the debt is discharged—no part of a child-support debt is "dischargeable under any circumstances" in a Chapter 13 case. Espinosa, 130 S. Ct. at 1379 n.10. Accordingly, the bankruptcy court was mistaken in its belief (1) that the disallowed portion of Diaz's claim was discharged and (2) that the Florida DOR's and Virginia DSS's post-discharge efforts to collect unpaid interest on Diaz's child-support obligation could constitute violations of the discharge injunction.

## B. Res Judicata and Collateral Estoppel

Both the bankruptcy court and the district court also erred in concluding that the Florida DOR and Virgina DSS violated the discharge injunction because the

doctrines of res judicata and collateral estoppel preclude the agencies from relitigating the amount of Diaz's child-support debt.

As an initial matter, the courts' conclusion reflects a fundamental misunderstanding of the issue presented by Diaz's contempt motion. Diaz's motion alleges that the agencies <u>violated the discharge injunction</u>. The merits of Diaz's position turn on a single inquiry: did the Florida DOR and Virginia DSS attempt to collect a debt that the bankruptcy court discharged? <u>See</u> 11 U.S.C. § 524(a)(2). As we have already explained, the Chapter 13 discharge provision answers that question in the negative, regardless of the amount of the debt. Thus, we are at a loss to figure out how the bankruptcy court's and the district court's premise that the Florida DOR and Virginia DSS cannot now relitigate the amount of the debt leads to the conclusion that the agencies <u>violated the discharge injunction</u>.[15]

---

[15]The bankruptcy court and the district court may have reasoned that if the Florida DOR and Virginia DSS were barred from relitigating the amount of the debt, then the agencies violated the discharge injunction because they tried to collect a debt that was fully satisfied during the bankruptcy. But that rationale erroneously assumes that whether the child-support debt was satisfied is somehow relevant to the question whether the Florida DOR and Virginia DSS could run afoul of the discharge injunction by trying to collect that debt outside of bankruptcy. In the case of a child-support debt, whether the debt was <u>satisfied</u> is unrelated to the question whether the debt was <u>discharged</u>. Such a debt is <u>never</u> dischargeable in a Chapter 13 bankruptcy, regardless of whether it was paid in full through the bankruptcy plan. As we discuss in more detail below, this does not mean that the Florida DOR and Virginia DSS are legally entitled to collect twice on any portion of the debt that was paid during the bankruptcy. It means only that the Florida DOR and Virginia DSS could not have violated the Bankruptcy Code's discharge injunction by trying to collect child-support from Diaz after the discharge, even if the agencies

30

Furthermore, the doctrines of res judicata and collateral estoppel do not bar the Florida DOR and Virginia DSS from "relitigating" the amount of the debt in any event. The agencies are not attempting to relitigate this issue, as it was never litigated during the underlying bankruptcy proceedings. The bankruptcy court and the district court mistakenly treated the bankruptcy court's order sustaining Diaz's claim objection and reducing the Florida DOR's allowed claim as an adjudication of the total amount of the child-support debt. But the only issue before the bankruptcy court at the time of the claim objection was the amount of the child-support debt that would be paid by the bankruptcy estate through Diaz's Chapter 13 plan, not the total amount of the child-support debt. See In re Bell, 236 B.R. at 429.

We also find compelling the logic of this Court and several others that have addressed the question whether preclusion doctrines can be used to prevent a creditor who holds a nondischargeable tax debt from arguing that the amount of the debt exceeds the payment that the creditor received during bankruptcy. Courts have consistently found theories of preclusion inapplicable in these circumstances. See, e.g., In re Gurwitch, 794 F.2d 584, 585 (11th Cir. 1986) (rejecting the debtor's argument that the IRS's filing of a proof of a claim and the bankruptcy

_____

sought to collect portions of the debt that had already been satisfied.

court's confirmation of a plan that provided for payment in full of that claim amounted to a final determination of the debtor's tax liabilities, thereby preventing the IRS from collecting pre-petition tax delinquencies after the discharge; explaining that res judicata did not apply because the Bankruptcy Code made clear that the taxes were not dischargeable regardless of whether a bankruptcy claim was filed or allowed); In re DePaolo, 45 F.3d 373, 376 (10th Cir. 1995) ("While principles of res judicata apply generally to bankruptcy proceedings, the plain language of [the Bankruptcy Code] forbid[s] the application of those principles to the facts of this case. By expressly providing that the described taxes are not discharged 'whether or not a claim for such taxes was filed or allowed,' Congress has determined that the IRS may make a claim for taxes for a particular year in a bankruptcy proceeding, accept the judgment of the bankruptcy court, then audit and make additional claims for that same year, even though such conduct may seem inequitable or may impair the debtor's fresh start." (footnote and citation omitted)); In re Fein, 22 F.3d 631, 633 (5th Cir. 1994) ("Fein contends that the discharge of claims in bankruptcy serves as res judicata, barring the government's claim [for pre-petition tax delinquencies]. Because the Bankruptcy Code specifically makes this claim nondischargeable, however, res judicata does not bar it." (citing In re Gurwitch)).

Although the cases cited above involved nondischargeable tax obligations, the rationale of those cases applies with equal force in the context of nondischargeable child-support obligations.  The holdings of those cases rested on the premise that the plain language of the Bankruptcy Code provides that a discharge "does not fix tax liabilities made nondischargeable under 11 U.S.C. § 523."  In re Gurwitch, 794 F.2d at 585.  The Code similarly makes clear that a Chapter 13 discharge does not fix child-support liabilities made nondischargeable under 11 U.S.C. § 523.  See 11 U.S.C. § 1328(a)(2).  Accordingly, res judicata and collateral estoppel do not preclude the Florida DOR and Virginia DSS from arguing the extent of Diaz's personal liability for child support post-bankruptcy.[16]

## C.      Discharge-Injunction Conclusion

In short, Congress has drafted the Bankruptcy Code such that child-support debts are never dischargeable in a Chapter 13 proceeding.  This reflects

---

[16]We note that a contrary conclusion could be especially problematic in the context of child-support obligations.  If bankruptcy courts could fix a debtor's personal liability for child-support through rulings on a claim objection or confirmation of a Chapter 13 plan, this would often result in de facto modification of state child-support orders.  Federal bankruptcy courts have no business becoming embroiled in state domestic relations to such a degree.  See Carver v. Carver, 954 F.2d 1573, 1579 (11th Cir. 1992) ("Nor was it the intent of the new Bankruptcy Code to convert the bankruptcy courts into family or domestic relations courts—courts that would in turn, will-nilly, modify divorce decrees of state courts insofar as these courts had previously fixed the amount of alimony and child-support obligations of debtors." (internal quotation marks omitted)); In re Harrell, 754 F.2d 902, 907 (11th Cir. 1985) ("[L]imited to its proper role, the bankruptcy court will not duplicate the functions of state domestic relations courts, and its rulings will impinge on state domestic relations issues in the most limited manner possible.").

Congress's policy decision that payment of child support is more important than a debtor's financial "fresh start." Bankruptcy courts are not free to override the plain language of the Code and Congress's policy choice by using a ruling on a debtor's claim objection or doctrines of preclusion to transform a nondischargeble child-support obligation into a dischargeable debt. Therefore, Diaz's child-support obligation was not discharged, and the bankruptcy court and the district court erred in determining that the Florida DOR and Virginia DSS violated the discharge injunction by attempting to collect child-support arrearages from Diaz after the discharge.[17]

We caution that our holding should not be read to suggest that Diaz remains personally liable for any child support that the Florida DOR and Virginia DSS

---

[17]As noted in the background section, the bankruptcy court also determined that the Florida DOR and Virginia DSS should be held in contempt for violating various court orders by seeking to collect from Diaz personally after the discharge. Specifically, the court concluded that the agencies violated the discharge order; the order reducing the Florida DOR's allowed claim to $47,746.49; the order confirming Diaz's Chapter 13 plan; and the order approving the trustee's report, discharging the trustee, and closing the estate. This unsupported and erroneous conclusion does not merit extended discussion.

Before holding a litigant in civil contempt for violating a court order, a court must find by clear and convincing evidence that the order unambiguously proscribed the litigant's conduct. See McGregor v. Chierico, 206 F.3d 1378, 1383 (11th Cir. 2000). Not one of the orders mentioned by the bankruptcy court even hinted that the Florida DOR and Virginia DSS could not pursue Diaz for child-support delinquencies after the discharge. In fact, the only order that addressed the effect of the discharge—namely, the discharge order—specifically stated that child-support debts are not discharged in a Chapter 13 case. Accordingly, the bankruptcy court abused its discretion by holding the Florida DOR and Virginia DSS in contempt for violating court orders.

already collected during bankruptcy.  To the extent that Diaz disputes the amount of child support he now owes, this is a matter that he is free to raise in a state court with jurisdiction.  See In re Harrell, 754 F.2d 902, 907 n.9 (11th Cir. 1985) ("The parties do not agree on the amount of debtor's [alimony] arrearages.  We decide here only that debtor's obligation is not dischargeable in bankruptcy.  The precise terms under which debtor's obligation can be enforced must be determined by the appropriate state court, if necessary."); see also Unif. Interstate Family Support Act § 607(a)(6) (amended 2008) (providing that a party may contest the validity of enforcement of a child-support order on the grounds that "full or partial payment has been made") (enacted in Florida at Fla Stat. § 88.6071(1)(f)  and in Virginia at Va. Code Ann. § 20-88.72(A)(6)).  Moreover, if the Florida DOR and Virginia DSS actually attempted to collect part of the child-support debt that had already been paid during bankruptcy, legal proceedings outside of the Bankruptcy Code may provide Diaz with a remedy.  These matters, however, are of no concern to us or to the bankruptcy court.  In the present case, the only question is whether the Florida DOR and Virginia DSS may be held in contempt for violating the discharge injunction.  We hold that they may not.

**CONCLUSION**

For the foregoing reasons, we hold that state sovereign immunity deprived the bankruptcy court of jurisdiction to entertain Diaz's contempt motion to the extent that the motion alleges violations of the automatic stay. We also hold that the Florida DOR and Virginia DSS did not violate the discharge injunction by attempting to collect a child-support debt after the bankruptcy court entered its discharge order because child-support obligations are nondischargeable in a Chapter 13 proceeding. Accordingly, we REVERSE the judgment of the district court affirming the bankruptcy court's order holding the Florida DOR and Virginia DSS in contempt for violating the automatic stay and discharge injunction, and we REMAND this case to the district court with instructions to vacate the bankruptcy court's order and dismiss the action.