[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12067
Oral Argument Calendar
_____

D.C. Docket No. 0:13-cv-62533-RSR,

Bkcy No. 08-bkc-10928-JKO

In Re: TOUSA, INC., et al.,

Debtors.

_____

WILMINGTON TRUST COMPANY,

Plaintiff - Appellant,

versus

JEFFERIES LEVERAGED CREDIT PRODUCTS, LLC,
CASTLE CREEK ARBITRAGE, LLC,

Defendants – Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 26, 2015)

Before MARTIN and DUBINA, Circuit Judges, and RODGERS,[*] District Judge.

MARTIN, Circuit Judge:

This bankruptcy appeal requires us to resolve a single issue of contract interpretation: whether certain claims against an insolvent property-development business should qualify as Senior Debt under the terms of the relevant agreements. Our resolution of this issue matters because holders of Senior Debt will recoup significantly larger portions of their claims than other debt holders under the confirmation plan approved by the Bankruptcy Court. The Bankruptcy Court and District Court both ruled in favor of the Claimants—Jefferies Leveraged Credit Products, LLC and Castle Creek Arbitrage, LLC[1]—holding that the seven disputed claims qualify as Senior Debt. Wilmington Trust Company, an unsecured creditor in the bankruptcy case and the indenture trustee for all of the senior notes, appeals the Senior Debt determination. After careful consideration, and with the benefit of

---

[*] Honorable Margaret C. Rodgers, Chief United States District Judge for the Northern District of Florida, sitting by designation.

[1] The Claimants purchased all rights to the disputed claims after the original contracting landowners filed proofs of claims in the bankruptcy case, and stand in their shoes before this Court. Castle Creek owns the Rock Springs Agreement claim, while Jefferies owns the six remaining claims.

oral argument, we agree that the disputed claims are entitled to Senior Debt status and affirm.[2]

## I.     BACKGROUND

The disputed property-development agreements at issue all originated with TOUSA Homes, Inc. (THI), one debtor in the bankruptcy case.  THI operated a home-building business that designed, built, and marketed single-family homes, town homes, and condominiums.  From 2003 to 2006, THI entered into contracts to sell land to landowners, with the understanding that THI retained the right to develop and market housing developments on the land.  These sales were effected by large up-front deposits from THI, which secured THI's obligation to repurchase the lots over time, as it was obligated to do in most of these transactions.  The contracts governing the seven land-development transactions at issue here (the Agreements) placed a series of additional obligations on THI, such as monthly "lot option" fees and the responsibility to purchase insurance and pay taxes.

As it was headed toward financial collapse, THI did not comply with the Agreement terms that required it to purchase land and make other payments.  On

---

[2] The Court sua sponte issued a jurisdictional question to the parties, asking whether the Bankruptcy Court's Senior Debt determination was a "final order" for purposes of 28 U.S.C. § 158(d).  After reviewing the parties' responses, we conclude that the order was final and that this Court has jurisdiction over Wilmington Trust's appeal.  To be final, "a bankruptcy court order must completely resolve all of the issues pertaining to a discrete claim, including issues as to the proper relief."  In re Donovan, 532 F.3d 1134, 1136–37 (11th Cir. 2008) (internal citations and quotation marks omitted).  Here, the discrete claim—that obligations under the Agreements were entitled to Senior Debt status—was fully resolved by the Bankruptcy Court's order.

January 29, 2008, THI, its parent company Technical Olympic USA, Inc., and a number of Technical Olympic USA's subsidiaries all filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of Florida. In the bankruptcy case, these debtors rejected all of the Agreements under 11 U.S.C. § 365, leaving the landowners with seven unsecured claims for recovery.[3] The parties have already settled the amounts to be paid in satisfaction of the claims, and the Bankruptcy Court confirmed the plan of reorganization. The only question that remains is what priority the claims should receive under that confirmed plan.

The plan's relevant priority structure is based on a subordination contract between Technical Olympic USA and its noteholders. In the early 2000s, Technical Olympic USA issued a series of senior and subordinated notes to raise capital, the terms of which were governed by separate indenture agreements.

---

[3] Wilmington Trust argues that the debtors' rejection of the Agreements transformed any arguable Senior Debt resulting from those agreements into mere general, unsecured claims for breach-of-contract damages. Section 365 permits the trustee to assume (carry forward to the new company) or reject (eliminate any ongoing business relationship with) any of the debtor's executory contracts or unexpired leases. Rejecting contracts under § 365 simply divides the obligations of the old debtor company from those of the reorganized entity. Nothing about the Code section or its interpretations indicate that rejection has any impact on the contractual subordination of debts used to structure claim payments. Instead, the sole purpose of § 365(g) is to treat rejection claims as prepetition damages rather than postpetition administrative expenses. See 3 Collier on Bankruptcy ¶ 365.09(1) ("Whether the resulting claim is secured or unsecured and entitled to priority, general or subordinated status will be determined generally by the terms of the contract or lease . . . Section 365(g)'s deemed breach is solely a timing mechanism to determine claim priorities (prepetition vs. postpetition) and to permit the creditor to seek allowance of its claim under section 502." (emphasis added)).

Under the Subordinated Notes Indenture, in the event of bankruptcy, any recovery on the subordinated notes goes directly to the senior notes until the senior notes are paid in full. The bankruptcy plan incorporated this distribution requirement by dividing the unsecured claims against THI into three classes, or categories: one for senior note claims (4A), one for general unsecured claims (4B), and one for subordinated note claims (4C). Under the plan, Senior Debt (as defined in the Subordinated Notes Indenture) will also be put into class 4A. The priority determination at issue has significant implications. Class 4A claims are estimated to receive 58% of their value. Class 4B claims, on the other hand, will receive an estimated 12% return. Claims in class 4C will get nothing, because any distribution they receive will be passed to class 4A until those claims are paid in full (which will never occur).

Claimants asked the Bankruptcy Court to clarify that the seven claims arising from the Agreements are Senior Debt which belong in class 4A, while Wilmington Trust responded that the claims should instead be in class 4B.[4] The Bankruptcy Court found that the seven claims are Senior Debt under three plausible categories of Debt, any one of which entitle the claims to class 4A treatment: (1) obligations for conditional sales, (2) obligations for the deferred

---

[4] If the disputed claims are entitled to Senior Debt status and are therefore included in class 4A, then Wilmington Trust's class 4A claims would be diluted to the extent there will be more claims made on the same pot of money.

purchase price of property, and (3) obligations that constitute debt for money borrowed.  Wilmington Trust appealed the Bankruptcy Court's determination to the District Court, and the District Court affirmed solely on the basis that the Agreements are conditional sales obligations.  Wilmington Trust timely appealed to this Court.

## II.    THE CONTRACTS

To resolve this appeal, we must evaluate the requirements contained in the seven property-development Agreements, and the definitions in the Subordinated Notes Indenture.  If claims under the Agreements fit the definition of Senior Debt in the Subordinated Notes Indenture, then the lower courts correctly placed them in class 4A.

### A.    PROPERTY-DEVELOPMENT AGREEMENTS

We first analyze the seven property-development Agreements.  THI entered into two different categories of Agreements: six lot option Agreements, and one Model Home Agreement.  All six lot option Agreements required THI to pay a significant sum of money upfront (10–30% of the total purchase obligation), along with a monthly lot option extension fee, which was due even if the agreement was terminated.  Under four out of the six lot option Agreements, as well as the Model Home Agreement, THI was obligated to purchase a minimum number of lots.

Finally, THI originally owned the property and then sold it to the landowner in four out of six lot option Agreements, as well as the Model Home Agreement.

## B.    SUBORDINATED NOTES INDENTURE

Next, we look to the Subordinated Notes Indenture.  Nobody disputes that the Subordinated Notes Indenture governs whether the Agreements are Senior Debt and therefore eligible for class 4A treatment.  The parties also agree about what is at issue: the definitions of "Senior Debt," "Obligations," and "Debt."  The only disagreement is whether the Agreements fit within these three definitions.

The Subordinated Notes Indenture defines Senior Debt as: "[A]ll of [THI's] Obligations with respect to Debt, whether outstanding on the Issue Date of the Notes or thereafter Incurred . . . ."  Bankr. ECF No. 9261-1 at 21.  Obligations are defined as "any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Debt."  Id. at 15.  Finally, the definition of Debt includes eight different categories.  The categories of Debt which are relevant to this appeal include:

- "[D]ebt of such Person for money borrowed"

- "[A]ll obligations of such Person issued or assumed as the deferred purchase price of Property"

- "[A]ll conditional sale obligations of such Person"

7

- "[A]ll obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business)"

- "[A]ll . . . Attributable Debt in respect of Sale and Leaseback Transactions entered into by such Person."

Id. at 9. In short, Senior Debt is all of THI's Obligations with respect to Debt.

## III.    DISCUSSION

We independently review the District Court's decision to affirm the Bankruptcy Court, applying the same standards of review as the District Court itself used. In re Diaz, 647 F.3d 1073, 1082 (11th Cir. 2011). We review the Bankruptcy Court's findings of fact under the clearly erroneous standard, and review de novo its findings on questions of law. See In re Int'l Admin. Servs., Inc., 408 F.3d 689, 698 (11th Cir. 2005). The parties agreed that New York law governs the interpretation of the Subordinated Note Indenture, and they stipulated before the Bankruptcy Court that New York law would require a plain-meaning analysis of the definitions which are not terms of art in the contract.

The plain language of the Subordinated Notes Indenture is clear. Any obligation fitting within the categories listed above is Debt. Next, Obligations are "liabilities payable under the documentation governing any Debt." Thus, if the Agreements contain any obligation that qualifies as Debt, then all liabilities in the

8

Agreements—the "documentation governing" Debt—are Obligations.[5]  And Senior Debt encompasses anything that is an Obligation.  We therefore consider whether the Agreements contain any obligation that qualifies as Debt.  We find that they do.

## A.    CONDITIONAL SALE OBLIGATIONS

The first category of Debt that reaches obligations in the Agreements relates to conditional sales.  A conditional sale has four criteria: (1) the buyer takes possession of the property; (2) the seller retains title to the property; (3) the buyer has an obligation to pay the purchase price; and (4) upon such payment, title will transfer to the buyer.  See Black's Law Dictionary 1537 (10th ed. 2014); see also Schnitzer v. Fruehauf Trailer Co., 128 N.Y.S.2d 242, 253 (N.Y. App. Div.), aff'd, 122 N.E.2d 754 N.Y. (1954).

Five of the seven Agreements contain obligations that meet this test: the Rock Springs, LLV, Ladera, Highland Meadows, and Model Home Agreements. First, in each of those Agreements, THI had possession of the properties.  THI had the right to develop the land, paid property taxes, was liable for any harm caused on the land, and was responsible for obtaining insurance on the land.  Although

---

[5] Counsel for the Unsecured Creditors' Committee (which represented the interests of Wilmington Trust before the Bankruptcy Court) acknowledged that the Subordinated Notes Indenture must be read in this manner. See Hr'g Tr. 47:5–11, July 24, 2013, Bankr. ECF No. 9450 (THE COURT: " . . . if any part of the obligations under any of these lot option agreements constitute debt obligations, then all of the obligations under the agreement constitute debt obligations."  ATTORNEY: "I don't disagree with that analysis.").

THI did not have every right associated with holding title, like the ability to lease or transfer the land to a third party, Wilmington Trust points to no case that requires this entire panoply of rights to constitute possession. Second, in all instances the landowner retained title to the properties. Third, the five Agreements contained obligations to purchase land.[6] Finally, under the Agreements, title transferred to THI upon completion of the sale. The Rock Springs, LLV, Ladera, Highland Meadows, and Model Home Agreements contain conditional sale Debt obligations.[7]

We reject the lower courts' holding that the Victoria Parc and Eagle Dunes Agreements have conditional sale obligations. Unlike the other five Agreements, the Victoria Parc and Eagle Dunes Agreements do not contain provisions that mandate a minimum purchase of lots prior to termination of the contract. As explained above, one key factor in the conditional-sale analysis is an actual obligation to make a purchase. Both the Bankruptcy Court and the District Court looked to the high penalty that would accrue if THI did not purchase lots, including

---

[6] Wilmington Trust argues that the lot option Agreements are nothing more than option contracts and did not obligate the landowners to make any purchases. In making this argument, it relies heavily on the terms used to label the Agreements. Yet longstanding contract interpretation principles make clear that we are not bound by the headings and labels created by the drafter, and instead interpret the document as a whole to determine the parties' intent. See Heryford v. Davis, 102 U.S. 235, 243–44 (1880). These were not mere options contracts. Though THI retained an option to purchase more than the minimum number of lots, the costs, fees, and minimum-purchase obligations were mandatory in no uncertain terms.

[7] Because we conclude that the Rock Springs, LLV, Ladera, Highland Meadows, and Model Home Agreements include conditional sale obligations, we do not analyze whether they also contained deferred purchase-price obligations.

forfeiture of the more than $2.5 million upfront cash deposit under each Agreement. While the steep cost of nonperformance might persuade many rational actors to purchase the lots, we conclude that those Agreements do not contain an obligation to do so.

## B.    DEBT FOR MONEY BORROWED

Still, the Victoria Parc Agreement includes a Debt obligation in the form of debt for money borrowed. We therefore affirm on this alternate ground. On December 28, 2005, the Victoria Parc Agreement was amended to "fund" an additional $9.9 million to THI. In exchange for the landowner's infusion of money, the per-lot purchase price was increased by nearly 50%, along with a $1.8 million increase in the lot option deposit. The evidence shows that THI used the Victoria Parc Agreement to borrow money from the landowner, and created a debt instrument in exchange. Even if the Victoria Parc Agreement did not originally create debt for money borrowed, its later modification provides clear evidence that THI ultimately used the agreement for precisely that purpose.

## C.    SALE-LEASEBACK TRANSACTION

Similarly, the Eagle Dunes Agreement contains Debt in the form of a sale-leaseback obligation, and we affirm on that ground.[8] The Subordinated Notes

---

[8] Though neither the Bankruptcy Court nor the District Court rested its Senior-Debt determination on this basis, we may affirm for "any reason, regardless of whether it was raised below." Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1059 (11th Cir. 2007).

11

Indenture defines a Sale and Leaseback Transaction as "any direct or indirect arrangement relating to Property now owned or hereafter acquired whereby the Company or a Restricted Subsidiary transfers such Property to another Person, and the Company or a Restricted Subsidiary leases it from such Person."  The Eagle Dunes Agreement involved the transfer of land that originally belonged to THI.  At the time it signed the Agreement, THI sold its property to the landowner.  Pursuant to the Eagle Dunes Agreement, THI leased the property back from the landowner, who "convey[ed] the right to use and occupy the property [to THI] in exchange for consideration."  Jayne v. Talisman Energy USA, Inc., 923 N.Y.S.2d 271, 273 (N.Y. App. Div. 2011) (quotation omitted).  THI paid consideration in the form of an upfront deposit and a series of monthly lot option extension fees, and it had the right to occupy and develop the land.  The Eagle Dunes Agreement therefore contained obligations that were Debt in the form of a Sale and Leaseback Transaction.

## IV.   CONCLUSION

Each of the seven Agreements at issue contains a form of Debt.  And any requirement in the Agreements is an Obligation.  For that reason, the terms of the Subordinated Notes Indenture require us to place any claims under the seven Agreements into the category of Senior Debt.  Because Claimants' proofs of claims

12

are Senior Debt, Wilmington Trust and the other senior noteholders in class 4A

must share their preferred status under the plain meaning of the contracts.

**AFFIRMED.**