PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 20-1061; 20-1062 and 20-1063
_____

In re:  VENOCO LLC, d/b/a Venoco, Inc., et al.,

Debtors


EUGENE DAVIS, in his capacity as Liquidating Trustee of
the Venoco Liquidating Trust

v.

STATE OF CALIFORNIA; CALIFORNIA LANDS
COMMISSION,

Appellants


_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action Nos. 1-19-mc-00007; 1-19-mc-00011 and
1-19-cv-00463)
District Judge: Honorable Colm F. Connolly

_____

Argued September 23, 2020

Before: AMBRO, PORTER, and ROTH, <u>Circuit Judges</u>

(Opinion filed: May 24, 2021 )

Edward K. Black
Office of Attorney General of Delaware
Delaware Department of Justice
820 North French Street
Carvel Office Building
Wilmington, DE 19801

Mitchell E. Rishe (Argued)
Office of Attorney General of California
300 South Spring Street
Suite 1702
Los Angeles, CA 90013

     Counsel for Appellant State of California


David M. Fournier
Kenneth A. Listwak
Troutman Pepper LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19899

Steven S. Rosenthal (Argued)
Marc S. Cohen
Laura K. McNally
Alicia M. Clough
Loeb & Loeb LLP
901 New York Avenue, N.W.
Suite 300 East
Washington, DC 20001

       Counsel for Appellant California Lands
       Commission

Mark E. Dendinger
Bracewell LLP
185 Asylum Street
CityPlace I, 34th Floor
Hartford, CT 06371

Warren W. Harris (Argued)
Bracewell LLP
711 Louisiana Street
Suite 2300
Houston, TX 77002

Jason Hutt
Brittany M. Pemberton
Bracewell LLP
2001 M Street, N.W.
Suite 900
Washington, DC 20036

       Counsel for Appellee

AMBRO, Circuit Judge

States can generally assert sovereign immunity to shield themselves from lawsuits, but bankruptcy proceedings are one of the exceptions. The Supreme Court held in *Central Virginia Community College v. Katz*, 546 U.S. 356, 378 (2006), that, by ratifying the Bankruptcy Clause of the U.S. Constitution, states waived their sovereign immunity defense in proceedings that further a bankruptcy court's exercise of its jurisdiction over property of the debtor and its estate (called "*in rem* jurisdiction"). Here, we apply *Katz* to a bankruptcy adversary proceeding brought by a liquidating trustee for the debtors' assets seeking compensation from the State of California and its Lands Commission for the alleged taking of a refinery that belonged to the debtors. Because that proceeding asks the Bankruptcy Court to enforce rights in the property of the debtors and their estates[1] and will facilitate the fair distribution of their assets to creditors, it furthers the Court's *in rem* functions. *Katz* thus forecloses the assertion of sovereign immunity by both California and its Lands Commission, and we affirm the District Court's order affirming the Bankruptcy Court's decision.

---

[1] "Under the Bankruptcy Code . . . a petition 'creates an estate' that, with some exceptions, comprises 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *City of Chicago v. Fulton*, 141 S. Ct. 585, 589 (2021) (quoting 11 U.S.C. § 541(a)(1)).

## I.     FACTS AND PROCEDURAL HISTORY

Venoco, LLC and its affiliated debtors (collectively, "Venoco" or the "Debtors")[2] operated the Platform Holly drilling rig in the South Ellwood Oil Field (the "Offshore Facility") off the coast of Santa Barbara, California. After extraction, the oil and gas were transported three miles north to the Ellwood Onshore Facility (the "Onshore Facility") for processing and refining. Venoco did not own the Offshore Facility and instead leased it from the State of California (the "State") acting through its Lands Commission (together with the State, the "California Parties"). Unlike the Offshore Facility, Venoco owns the Onshore Facility and holds the air permits to use it.

Following a pipeline rupture in 2015, Venoco could no longer get its oil and gas to the market. It was unable to reactivate the pipeline after it emerged from an initial bankruptcy filing in 2016, and it filed for Chapter 11 bankruptcy again on April 17, 2017 (the latter colloquially known as a "Chapter 22"). That same day, Venoco quitclaimed (*i.e.*, abandoned) its leases, thereby relinquishing all rights and interests in the Offshore Facility, including the wells and the Platform Holly drilling rig. Concerned about public safety and environmental risks, the Commission took over decommissioning the rig and plugging the abandoned wells. It initially agreed to pay Venoco approximately $1.1 million per month to continue operating the Offshore and Onshore Facilities. In September 2017, a third-party contractor took over operations from Venoco. In place of the previous

---

[2] The parties do not distinguish the various debtor entities.

5

agreement, the Commission and Venoco entered into a Gap Agreement, under which the Commission agreed to pay $100,000 per month, as well as additional compensation, for access to and use of the Onshore Facility. Meanwhile, the Commission also asserted its rights as Venoco's creditor. In October 2017, it filed an estimated $130 million contingent claim against Venoco for reimbursement of plugging and decommissioning costs, including $29 to $35 million for the cost to operate the Onshore Facility and the rig at the Offshore Facility.[3]

The Gap Agreement, as its name suggests, was not a permanent solution. For several months before the Bankruptcy Court confirmed the Debtors' plan of liquidation (the "Plan") in May 2018, Venoco and the Commission negotiated over a potential sale of the Onshore Facility to the Commission. When those negotiations failed, the Commission stopped paying what it owed under the Gap Agreement. Invoking its police powers to take necessary actions to protect the environment and public safety, the Commission argued it could continue using the Onshore Facility without payment.

Once the Plan became effective on October 1, 2018, the estates' assets, including the Onshore Facility, were transferred to a liquidation trust (the "Trust"). Eugene Davis, the court-

---

[3] In October 2018, the Commission also filed in the Bankruptcy Court an "Assertion of Administrative Expense Claim and Reservation of Setoff Rights," which sought to preserve the Commission's right to "set off its allowable administrative claim against any claims that have been or may be asserted [against it] by the [Trustee]." JA 594–610. That document was withdrawn in September 2019.

6

appointed liquidation trustee (the "Trustee"), became responsible for collecting, holding, liquidating and distributing the Trust's assets for the benefit of Venoco's creditors.

After the Gap Agreement was terminated on October 15, 2018, the Trustee filed in the Bankruptcy Court an adversary proceeding against the California Parties (the "Adversary Proceeding"). It is primarily a claim for inverse condemnation, "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2168 (2019) (citation omitted). It "stands in contrast to direct condemnation, in which the government initiates proceedings to acquire title under its eminent domain authority." *Id.* The Trustee argues that, under the U.S. and California Constitutions as well as § 105 of the Bankruptcy Code,[4] the Trust is entitled to just compensation for the taking of its property by the California Parties. While the Trustee's claims are primarily against the Commission, he also sued the State "out of an abundance of caution." Trustee's Br. at 40.

The California Parties filed motions to dismiss, claiming, among other things, they as sovereigns are immune from suits. The Bankruptcy Court denied the motions. The District Court granted leave for the California Parties to appeal only the Bankruptcy Court's ruling on their sovereign immunity defense and did not allow interlocutory appeal of

---

[4] 11 U.S.C. § 105 is an "omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case." 2 Collier on Bankruptcy ¶ 105.01 (16th ed. 2021).

7

other issues. It affirmed the Bankruptcy Court's rejection of the California Parties' assertion of Eleventh Amendment sovereign immunity and held that they forfeited their argument on state law immunity from liability (often called "substantive immunity") when they failed to raise the argument before the Bankruptcy Court. The California Parties appeal to us, arguing they can assert both Eleventh Amendment and substantive immunity defenses.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 158(a)(3) over the appeal of the Bankruptcy Court's decision. For the appeal to our Court, the denial of a claim of sovereign immunity is "immediately appealable under the collateral order doctrine [which permits appeals of some non-final orders], imbuing us with jurisdiction under 28 U.S.C. § 1291." *See Maliandi v. Montclair State Univ.*, 845 F.3d 77, 82 (3d Cir. 2016); *see also P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993). We exercise plenary review of the Bankruptcy and District Courts' legal determinations, *see In re Goody's Family Clothing Inc.*, 610 F.3d 812, 816 (3d Cir. 2010), which includes their denial of governmental immunity, *see Maliandi*, 845 F.3d at 82.

## III. LEGAL BACKGROUND

This case reduces to one question: Under *Katz*, can the California Parties assert a defense of sovereign immunity in the Adversary Proceeding? Given disagreement on the scope of proceedings covered by *Katz*, we first summarize how the case law developed and then distill the analytical framework.

8

## A. Case Law Before *Katz*

In our constitutional structure, states "maintain certain attributes of sovereignty, including sovereign immunity." *In re PennEast Pipeline Co.*, 938 F.3d 96, 103 (3d Cir. 2019), *cert. granted*, *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 1289 (Mem.) (2021) (quoting *P.R. Aqueduct*, 506 U.S. at 146). This includes, but is not limited to, their immunity from suit in federal court recognized by the Eleventh Amendment, which reads in part that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI.[5] This shelter from suit is a "fundamental aspect of the sovereignty which the [s]tates enjoyed before the ratification of the Constitution, and which they retain today." *PennEast*, 938 F.3d at 103 (quoting *Alden v. Maine*, 527 U.S. 706, 713 (1999)).

However, the sovereign immunity states enjoy is not absolute. They can expressly consent to suit in federal court by voluntarily invoking the jurisdiction of federal courts. *See Lombardo v. Pennsylvania, Dep't of Pub. Welfare*, 540 F.3d 190, 196 (3d Cir. 2008). Congress can abrogate states' immunity from suit by unequivocally expressing its intent to do so per valid constitutional authority. *See Seminole Tribe of*

---

[5] In *Hans v. Louisiana*, 134 U.S. 1, 10 (1890), the Supreme Court decided that the Eleventh Amendment also covers suits by in-state plaintiffs. Thus the Eleventh Amendment "bar[s] all private suits against non-consenting [s]tates in federal court." *Lombardo v. Pennsylvania, Dep't of Pub. Welfare*, 540 F.3d 190, 194 (3d Cir. 2008).

*Fla. v. Florida*, 517 U.S. 44, 55 (1996). Also, by ratifying the U.S. Constitution, states consented to certain waivers of their sovereign immunity in the "plan of the convention," including suits by the federal government against them in federal court. *PennEast*, 938 F.3d at 103–04 (quoting *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991)).

Before *Katz*, courts faced with the assertion of sovereign immunity in bankruptcy proceedings focused on the scope of congressional (that is, statutory) abrogation. *See Seminole Tribe*, 517 U.S. at 72 n.16 ("[I]t has not been widely thought that the federal antitrust, bankruptcy, or copyright statutes abrogated the [s]tates' sovereign immunity."); *Hoffman v. Conn. Dep't of Income Maint.*, 492 U.S. 96, 104 (1989) (holding that the Bankruptcy Code "did not abrogate the Eleventh Amendment immunity of the [s]tates"); *see also United States v. Nordic Vill., Inc.*, 503 U.S. 30, 39 (1992) (holding that the Bankruptcy Code did not clearly abrogate the federal government's immunity from suits for monetary relief). In these cases, the question was mainly one of statutory interpretation—whether Congress unequivocally expressed its intent to end immunity. *Seminole Tribe*, 517 U.S. at 55; *Hoffman*, 492 U.S. at 104 ("[W]e need not address whether [Congress] had the authority to [abrogate sovereign immunity] under its [constitutional] bankruptcy power.").

In 1994, Congress amended the Bankruptcy Code in an attempt to overrule the decisions in *Hoffman* and *Nordic Village*. *See In re Sacred Heart Hosp.*, 133 F.3d 237, 242 n.8 (3d Cir. 1998). Some circuits, including our own, concluded that although Congress now "unequivocally expressed its intent to abrogate the states' Eleventh Amendment immunity under the Bankruptcy Code," the Constitution's "Bankruptcy

10

Clause [which authorizes Congress to enact "uniform Laws on the subject of Bankruptcies throughout the United States"] is not a valid source of abrogation power." *Id.* at 243. These holdings, while never explicitly overturned, were soon displaced by subsequent Supreme Court case law.

In 2004, the Court set out to resolve a circuit split on the validity of the Bankruptcy Code's purported abrogation of sovereign immunity but ended up avoiding the issue altogether. In *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 448 (2004), it rejected an assertion of sovereign immunity involving the discharge of student debt guaranteed by an arm of the State of Tennessee, concluding that when the "bankruptcy court's jurisdiction over the res is unquestioned, . . . the exercise of its *in rem* jurisdiction to discharge a debt does not infringe state sovereignty." *Id.* (internal citation omitted).[6] The Court did not address the Sixth Circuit's holding that the Bankruptcy Code validly abrogated state sovereign immunity. *See id.* at 445 ("Because we hold that a bankruptcy court's discharge of a student loan debt does not implicate a [s]tate's Eleventh Amendment immunity, we do not reach the broader question addressed by the Court of Appeals."). To make the limited reach of its opinion clear, the Court explained that its decision "is not to say[] a bankruptcy court's *in rem* jurisdiction overrides sovereign immunity . . . . [n]or . . . that every exercise of a bankruptcy court's *in rem* jurisdiction will

---

[6] In the bankruptcy context, the debtor's estate is often referred to as the "res" to be administered by the bankruptcy court. *See, e.g.*, *In re Phila. Ent. & Dev. Partners, L.P.*, 549 B.R. 103, 145 (Bankr. E.D. Pa. 2016); *In re Metromedia Fiber Network, Inc.*, 299 B.R. 251, 273 (Bankr. S.D.N.Y. 2003) ("The debtor's estate is a res.").

not offend the sovereignty of the State." *Id.* at 451 n.5 (internal quotation marks and citation omitted).

## B. *Katz*

The Supreme Court expanded *Hood*'s narrow holding two years later in *Katz*, which clarified federal power over states in bankruptcy cases. There the liquidating supervisor of a bookstore that filed for Chapter 11 bankruptcy sought to recover preferential transfers[7] made to Virginia educational institutions that were arms of the Commonwealth otherwise entitled to sovereign immunity. *Katz*, 546 U.S. at 360. The Court sided with the supervisor and rejected the assertion of sovereign immunity. We start with three non-controversial observations about *Katz*.

First, under the Constitution's Bankruptcy Clause, states are deemed to have waived their sovereign immunity in certain bankruptcy proceedings. *Id.* at 378 ("In ratifying the Bankruptcy Clause, the [s]tates acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts."). Thus we look to the scope of constitutional waiver recognized by *Katz* instead of congressional abrogation through the Bankruptcy Code (though, as a theoretical matter, Congress could still through

---

[7] Preferential transfers are defined in 11 U.S.C. § 547(b). They are basically payments made by the debtor to a creditor within a short time before the bankruptcy filing that improve (hence "prefer") the creditor's recovery from what it would otherwise receive in the bankruptcy.

legislation "exempt [states] from operation of [certain bankruptcy] laws," *id.* at 379).

Second, *Katz* did not foreclose the sovereign immunity defense in all bankruptcy proceedings. *See id.* at 378 n.15 ("We do not mean to suggest that every law labeled a 'bankruptcy' law could, consistent with the Bankruptcy Clause, properly impinge upon state sovereign immunity.").[8] Still, at least one later opinion suggests a broader reading of

---

[8] At least one court has relied on this language to suggest that *Katz* only applies to claims "created by the Bankruptcy Code." *Shieldalloy Metallurgical Corp. v. N.J. Dep't of Env't Prot.*, 743 F. Supp. 2d 429, 439 (D.N.J. 2010). We disagree because *Katz* repeatedly referenced bankruptcy "proceedings." *See Katz*, 546 U.S. at 362; *see also Allen v. Cooper*, 140 S. Ct. 994, 1002 (2020) ("[W]e held that Article I's Bankruptcy Clause enables Congress to subject nonconsenting [s]tates to *bankruptcy proceedings*." (emphasis added)); *see also* Ralph Brubaker, *Explaining Katz's New Bankruptcy Exception to State Sovereign Immunity: The Bankruptcy Power as a Federal Forum Power*, 15 Am. Bankr. Inst. L. Rev. 95, 129 (2007) (suggesting *Katz* gave Congress the power to *"bind states to[] uniform federal judicial [bankruptcy] process"* (emphasis omitted)). In any event, focusing on claims "created" by the Bankruptcy Code is an unworkable approach, considering the Code often incorporates applicable state laws. *See, e.g.*, 11 U.S.C. § 544(b)(1) (permitting the trustee to recover transfers that are voidable under state laws); *In re DBSI, Inc.*, 463 B.R. 709, 718 (Bankr. D. Del. 2012) (explaining that, when applying *Katz*, "[t]he fact that various state laws are implicated is no ground for constitutional concern").

*Katz*.  In *Allen v. Cooper*, 140 S. Ct. 994, 1002 (2020), the Supreme Court held that the Constitution's Intellectual Property Clause[9] did not authorize Congress to abrogate states' Eleventh Amendment immunity from copyright infringement suits.  To distinguish that case from *Katz*, the Court emphasized that the Bankruptcy Clause was unique among Article I's grant of authority, explaining that "[i]n bankruptcy, we decided[] sovereign immunity has no place," as "the Bankruptcy Clause embraced the idea that federal courts could impose on state sovereignty."  *Id.*  However, we do not think that *dictum* in *Allen* means sovereign immunity can never be asserted before a bankruptcy court, for *Katz* was clear that it was deemed waived in some but not all bankruptcy proceedings.

Finally, while *Katz* discussed the bankruptcy court's *in rem* jurisdiction as the historical underpinning for waiving state sovereign immunity, it does not require a proceeding to be technically *in rem*.  546 U.S. at 370.  Indeed, although the preference action in *Katz* was not squarely *in rem*, sovereign immunity still could not be asserted where any court order issued in the action would be "ancillary to and in furtherance of the court's *in rem* jurisdiction, [even if it] might itself involve *in personam* process."  *Id.* at 372.  The focus is on function and not form, the benefit being that courts do not need to struggle with the "blurred distinctions and perplexing case law [that confuse] *in rem*, ancillary to *in rem*, and even *in*

---

[9] Congress has the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. art. I, § 8, cl. 8.

*personam* proceedings in many respects." *In re DBSI, Inc.*, 463 B.R. 709, 714 (Bankr. D. Del. 2012).

We therefore summarize *Katz*'s holding as follows: States cannot assert a defense of sovereign immunity in proceedings that further[10] a bankruptcy court's *in rem* jurisdiction no matter the technical classification of that proceeding.

## C. Analytical Framework for Applying *Katz*

*Katz* did not define the range of proceedings that further a bankruptcy court's *in rem* jurisdiction, but it did tell us bankruptcy's three critical functions: "[1] the exercise of exclusive jurisdiction over all of the debtor's property, [2] the equitable distribution of that property among the debtor's creditors, and [3] the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *In re Diaz*, 647 F.3d 1073, 1084 (11th Cir. 2011) (quoting *Katz*, 546 U.S. at 363–64). We agree with the Eleventh Circuit and several bankruptcy courts that "[t]hese guidelines provide a useful starting point." *Id.*; *see, e.g.*, *In re Univ. of Wis. Oshkosh Found., Inc.*, 586 B.R. 458, 465 (Bankr. E.D. Wis. 2018); *In re Odom*, 571 B.R. 687, 695 (Bankr. E.D. Pa. 2017). Indeed, at oral argument counsel for the Trustee and

_____

[10] At various places the *Katz* opinion described proceedings where sovereign immunity is deemed waived as "merely ancillary to," "in furtherance of," or "necessary to effectuate" the bankruptcy court's *in rem* jurisdiction. 546 U.S. at 371–72, 378. We think these are similar concepts and use "further" as a shorthand to summarize *Katz*'s holding.

15

the Commission agreed that the proper framework analyzes whether a proceeding furthers any of these three functions. Oral Arg. Tr. 7:19–23, 24:4–9; *accord Diaz*, 647 F.3d at 1084.

Under this framework, courts must focus on function and not form when testing a proceeding's connection to the bankruptcy court's *in rem* jurisdiction. The first function asks whether the proceeding decides and affects interests in the res, the property of the debtor and its estate. Unsurprisingly, courts in our Circuit have already been asking this question when applying *Katz*. *See, e.g.*, *In re La Paloma Generating Co.*, 588 B.R. 695, 730 (Bankr. D. Del. 2018) (Sontchi, J.) ("[A] bankruptcy court's *in rem* jurisdiction would still need to focus[] on adjudications of interests in the underlying res."); *In re Phila. Ent. & Dev. Partners, L.P.*, 549 B.R. 103, 123 (Bankr. E.D. Pa. 2016), *aff'd*, 569 B.R. 394 (E.D. Pa. 2017), *rev'd on other grounds*, 879 F.3d 492 (3d Cir. 2018) (asking whether the claims "[i]mplicate an [i]dentifiable [r]es"). Relying on the first function, courts have found that states are deemed to waive sovereign immunity in most (i) turnover actions,[11] *see Philadelphia Entertainment*, 549 B.R. at 123 (holding "sovereign immunity [is] generally inapplicable to turnover actions"); *In re Kids World of America, Inc.*, 349 B.R. 152, 165–66 (Bankr. W.D. Ky. 2006) (same), (ii) fraudulent transfer actions,[12] *see DBSI*, 463 B.R. at 713–15 (explaining the clear

---

[11] Under 11 U.S.C. §§ 542 and 543, anyone in possession of the debtor's property may be required to return it—that is, turn it over—to the debtor or its trustee.

[12] Fraudulent transfers are defined in 11 U.S.C. § 548 and involve transfers made (1) with the intent to defraud creditors or (2) while the debtor was insolvent and for which the debtor did not receive "reasonably equivalent value." *See* 11 U.S.C.

parallels between preferences and fraudulent transfers), and (iii) contract disputes, *see In re DPH Holdings Corp.*, 448 F. App'x 134, 138 (2d Cir. 2011) (unpublished) ("The contracts, which include potential liabilities and responsibilities . . . , are part of [the debtor's] estate.").[13]

The second function captures proceedings where the connection to a specific piece of property may be lacking, but there is broader effect on the equitable distribution of the debtor's property. A violation of the automatic stay, where one creditor seeks to enforce remedies against the debtor's property despite the injunctive bar of the bankruptcy filing, is one such example due to the disruptive effects on orderly administration of the estate. *See Diaz*, 647 F.3d at 1086 ("[W]e have no difficulty concluding that contempt motions alleging that a creditor has violated the automatic stay *generally* qualify as 'proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts.'" (emphasis in original) (quoting *Katz*, 546 U.S. at 378)). Of course, there is also significant overlap between the first two functions. *Id.* at 1085–86 (explaining that the automatic stay implicates both functions).

---

§ 548(a)(1)(B)(i). 11 U.S.C. § 544(b)(1) also incorporates state fraudulent transfer laws. The principal goal is to prevent the debtor from "stiffing" creditors by giving away its property before filing for bankruptcy.

[13] To be clear, a sovereign immunity defense is not categorically foreclosed in those proceedings. *See, e.g.*, *Phila. Ent.*, 549 B.R. at 124 (explaining that a fraudulent transfer action relating to revocation of a slot machine license does not further a bankruptcy court's *in rem* jurisdiction because the license is not the debtor's property).

17

The third function simply acknowledges the holding of *Hood* that "[s]tates, whether or not they choose to participate in the [bankruptcy] proceeding, are bound by a bankruptcy court's discharge order no less than other creditors." *See Hood*, 541 U.S. at 448; *see also People v. Irving Trust Co.*, 288 U.S. 329, 333 (1933) (holding that states must comply with deadlines to file claims like other creditors because, "otherwise, orderly and expeditious proceedings would be impossible and a fundamental purpose of [bankruptcy] would be frustrated").

Courts thus analyze correctly if they ask whether a proceeding directly relates to one or more of these three functions. *See Diaz*, 647 F.3d at 1084 ("At a minimum, then, a proceeding must directly relate to one or more of these functions."). We do not offer a one-size-fits-all test because claims and proceedings in bankruptcy are varied and fact-specific.

## IV.   APPLICATION

With the framework for analysis set, we apply it here and conclude the California Parties cannot assert sovereign immunity in the Adversary Proceeding.

### A.  The Adversary Proceeding Furthers Two of Bankruptcy's Critical Functions.

At the outset, the Adversary Proceeding furthers the Bankruptcy Court's exercise of jurisdiction over property of the Debtors and their estates, as it seeks a ruling on rights in the Onshore Facility.  The California Parties repeatedly emphasize that the inverse condemnation claim is primarily

18

one for money damages. But that alone is irrelevant, for even if the action "may resemble money damage lawsuits in *form*, it is their *function* that is critical." *Diaz*, 647 F.3d at 1085 (internal quotations and citation omitted) (emphases in original). And while the Adversary Proceeding may not be clearly *in rem* in form, its function is to decide rights in Venoco's property. *See United States v. Sid-Mars Rest. & Lounge, Inc.*, 644 F.3d 270, 286 (5th Cir. 2011) (Dennis, J., dissenting) ("Although I have not found cases explicitly declaring that inverse condemnation suits are *in rem* proceedings, . . . they are substantially equivalent to condemnation actions and essential to the self-executing constitutional protection of private property owners from governmental takings without just compensation."). At its core, the Adversary Proceeding is about whether the California Parties can use Venoco's property for free. *See* JA 129, Complaint ¶ 37 ("Plaintiff is entitled to just compensation, including the fair market and fair rental value of the [Onshore Facility]."); *R & J Holding Co. v. Redevelopment Auth.*, 670 F.3d 420, 433 n.10 (3d Cir. 2011) (explaining that seeking "compensation for . . . inability to fully utilize, develop, and sell their property . . . . *are rights inhering in the property itself*" (emphasis added)).

The Adversary Proceeding also furthers the second critical function—facilitating equitable distribution of the estate's assets. The Onshore Facility is a significant asset for Venoco and its creditors. Indeed, the Plan's liquidation analysis acknowledged the Commission was "receiving significant value from the use of the Debtors' assets" and that the "value of the use of those assets [was] being negotiated between the parties." JA 589. Further, the Commission is a major creditor and filed a proof of claim against Venoco, so the

19

California Parties have a stake in how the Trust's assets are liquidated and distributed. And consider the consequences: If the California Parties could assert sovereign immunity in the Adversary Proceeding, they would have a win-win—able to recover from the Trust on account of their claims against Venoco while preventing any judicial scrutiny over whether they can use the Onshore Facility without payment. And they would improve their status vis-à-vis other creditors solely owing to their status as a state that can invoke sovereign immunity, just the kind of result *Katz* wanted to avoid. *See DBSI*, 463 B.R. at 713 ("[The aim of equitable distribution of the res], and the desire for uniform application of the bankruptcy laws, would be jeopardized if the states were able to draw resources from the *res* or retain estate property when other creditors were unable to do so." (citing *Katz*, 546 U.S. at 362–64)).

The California Parties urge that sovereign immunity is fundamental to our constitutional design and the exercise of eminent domain power is especially central to their sovereignty. Though true as a general matter, bankruptcy is a different ball game, and the effect on state sovereignty is not the focus of our analysis. The focus is instead on ensuring that sovereign immunity will not interfere with the bankruptcy court's jurisdiction over the estate's property as well as its orderly administration. The driving principle of the *Katz* decision is that the Bankruptcy Clause has a "unique history" and is "*sui generis* . . . among Article I's grants of authority," the result being "that federal courts could impose on state sovereignty" in bankruptcy proceedings. *Allen*, 140 S. Ct. at 1002 (internal citations omitted).

20

We are also unpersuaded that we must consider that the Adversary Proceeding is a type of action both "anomalous and unheard of when the Constitution was adopted." *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 755 (2002) (internal quotation and citation omitted). This simply asks for a duplicative and unnecessary historical analysis. *Katz* explained that the "Framers would have understood that laws 'on the subject of Bankruptcies' included laws providing, in certain limited respects, for more than simple adjudications of rights in the res . . . . More generally, courts adjudicating disputes concerning bankrupts' estates historically have had the power to issue ancillary orders enforcing their *in rem* adjudications." 546 U.S. at 370. Thus we do not need to analyze whether the exact proceeding existed at the Founding, for *Katz* already concluded that drawing the line at whether a proceeding furthers the bankruptcy court's *in rem* jurisdiction is consistent with the historical understanding of the scope of sovereign immunity waiver. *Id.*; *cf. Hood*, 541 U.S. at 452–53.

**B. The Deemed Waiver of Sovereign Immunity in *Katz* Can Apply to Post-Confirmation or Post-Effective Date Claims.**

The California Parties also argue that the Adversary Proceeding relates only to claims after the Plan was confirmed and became effective,[14] when the Debtors' estate ceased to

---

[14] The parties often use the terms "confirmation date" and "effective date" interchangeably, but there is a meaningful difference. Typically "the debtor's estate ceases to exist once confirmation [of a plan] has occurred." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 165 (3d Cir. 2004) (citation omitted); *see also*

21

exist, so there is no res for the bankruptcy court's jurisdiction to attach. The Trustee disputes this premise, explaining that, due to the nature of the Gap Agreement, the Adversary Proceeding also seeks to recover amounts owed for the improper taking of the Onshore Facility before the effective date. We do not need to decide whether the Adversary Proceeding only pertains to post-effective date claims, as we reject the California Parties' argument even if it were true.

The California Parties essentially ask us to read *Katz* narrowly to carve out all claims that occurred after Venoco's estate was vested in the Trust. We decline to do so. In *In re Resorts International, Inc.*, 372 F.3d 154, 166 (3d Cir. 2004), we held that a bankruptcy court could have jurisdiction over a proceeding even when the "estate" no longer technically exists, so long as the proceeding has a "close nexus to the bankruptcy plan or proceeding." To refresh, the issue of bankruptcy statutory jurisdiction is not before us because the District Court

---

11 U.S.C. § 1141(b) ("Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."). However, that is not the case here where the order confirming the Plan provided that Venoco's assets were vested in the Trust as of the Plan's effective date, not the confirmation date. *See* JA 459. While the effective date typically occurs shortly after confirmation, there was a nearly five-month delay here between confirmation in May 2018 and the Plan going effective in October 2018. Thus the relevant date for the California Parties' argument is the effective date, not the confirmation date, though this distinction does not affect the result we reach.

22

did not grant leave to the California Parties to appeal it. Still, the reasoning of *Resorts International* is of aid. There, we followed our precedent in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), which held bankruptcy courts have statutory jurisdiction over a proceeding "related to" bankruptcy if the outcome could affect "the estate being administered in bankruptcy." In that context, we refused to apply the "'effect on the bankruptcy estate' test so literally as to entirely bar post-confirmation bankruptcy jurisdiction." *Resorts Int'l*, 372 F.3d at 165.

Here, the Bankruptcy Court's critical *in rem* functions did not end when the Plan became effective, as the Trust exists primarily to facilitate the "equitable distribution of [the debtor's property] among the debtor's creditors." *Katz*, 546 U.S. at 364. Indeed, the Bankruptcy Court retained substantial control over the Trust assets, which were in essence a continuation of the estate.[15] As the Plan was one of liquidation,

---

[15] The Confirmation Order states that the Trustee "has been fully disclosed in the" Trust Agreement in compliance with Bankruptcy Code § 1129(a)(5), which requires debtors to "disclose[] the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as . . . a successor to the debtor under the plan." JA 448; *see* 11 U.S.C. § 1129(a)(5). The Trust Agreement further appointed Davis "as a representative of the Contributing Debtors' Estates pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B)," JA 302, and authorized him to "[a]llow, settle, object to or reconcile any Claims against the Contributing Debtors' Estates." JA 305. The Confirmation Order provides that the Court retained jurisdiction over, *inter alia*, actions "[t]o recover all assets of the Debtors and property of the Debtors' Estates, which shall

23

there was no reorganized debtor that continued to do business, the Debtors did not receive a discharge, *see* 11 U.S.C. § 1141(d)(3), and the Bankruptcy Court continued to oversee the Trust's administration and distribution of the estate's assets under the Plan, *see* 11 U.S.C. § 1142(b). *See also In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d 100, 107 (1st Cir. 2005) ("[A] liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court.").

Our holding is limited, and we do not try to define the entire scope of the Bankruptcy Court's *in rem* jurisdiction, which the *Katz* Court described as "premised on the debtor and his estate." 546 U.S. at 370 (quoting *Hood*, 541 U.S. at 447). We only hold that, in this case, the Bankruptcy Court's *in rem* jurisdiction extends to the estate's property transferred to the Trust for the purpose of liquidation and distribution to Venoco's creditors, and over which the Bankruptcy Court retained substantial control under the Plan. And, contrary to the California Parties' parade of horribles, our conclusion does not mean sovereign immunity is waived in every bankruptcy

---

be for the benefit of the Liquidating Trust, wherever located." JA 473. Moreover, the Trust Agreement provides that the Bankruptcy Court has jurisdiction over the Trust and Trustee, JA 316; requires court approval before selling or abandoning trust assets, JA 305; and states that "[a]ll funds in the Liquidating Trust shall be deemed in *custodia legis* [in the custody of the law] until" they are paid out, "and no Beneficiary . . . can bind, pledge, encumber, execute upon, garnish, or attach the Liquidating Trust Assets or the Liquidating Trustee in any manner or compel payment from the Liquidating Trustee except by order of the Bankruptcy Court," JA 317.

proceeding brought by a post-confirmation trustee. A court must still undertake the proper analysis under *Katz*, and it must also have statutory jurisdiction over the proceeding under *Resorts International*.

### C. The California Parties Cannot Assert Eleventh Amendment Immunity or State-Law Substantive Immunity from Liability.

As the Adversary Proceeding is the type of bankruptcy proceeding where states are deemed to waive their sovereign immunity, does that waiver extend to both defenses raised by the California Parties? To refresh, they assert Eleventh Amendment immunity and state-law substantive immunity from liability. In *Lombardo*, 540 F.3d at 199, we explained the difference between these two defenses. The first bars all private suits against non-consenting states in the federal courts. *See* U.S. Const. amend. XI; *Seminole Tribe*, 517 U.S. at 72–73; *Hans v. Louisiana*, 134 U.S. 1, 10 (1890). Second, seeing that the Eleventh Amendment does not define the entire scope of sovereign immunity, states may also have substantive immunity from liability defined under their own law. *See Lombardo,* 540 F.3d at 195. As the District Court aptly summarized, "[t]he question raised by substantive immunity from liability is whether the state has agreed to subject itself to liability. The question raised by Eleventh Amendment immunity is whether the state has consented to be sued in a federal court." *In re Venoco, LLC*, 610 B.R. 239, 247 (D. Del. 2020). The parties here do not dispute that *Katz* reaches a state's assertion of Eleventh Amendment immunity, so the California Parties' defense of Eleventh Amendment immunity

25

fails. As explained below, we also reject their assertion of state-law substantive immunity from liability.

At the outset, we agree with the District Court that the California Parties forfeited the argument they have immunity from liability when they failed to raise it in the Bankruptcy Court. *See In re Kaiser Grp. Int'l Inc.*, 399 F.3d 558, 565 (3d Cir. 2005) (noting the "general rule that when a party fails to raise an issue in the bankruptcy court, the issue . . . may not be considered by the district court on appeal"). The California Parties argue that the immunity-from-liability defense is jurisdictional and therefore can be raised at any time. We reject this view, as "[a] defense rooted in state law cannot define the jurisdiction of the federal courts, which derives from the Constitution and acts of Congress." *Green v. Graham*, 906 F.3d 955, 964 (11th Cir. 2018). The California Parties' reliance on *Edelman v. Jordan*, 415 U.S. 651, 678 (1974), is also misplaced, for that case only discussed Eleventh Amendment immunity, which "sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *Id.* And the Supreme Court never even decided "that Eleventh Amendment immunity is a matter of subject-matter jurisdiction," *see Wis. Dep't of Corrs. v. Schacht*, 524 U.S. 381, 391 (1998), and certainly never suggested that the immunity-from-liability defense could be jurisdictional.

Had we reached the merits, the California Parties would still not have prevailed, for it is well settled they can be sued in California courts for the alleged violation of the Takings Clause under the U.S. or California Constitutions; so they are not actually immune from liability under California law. *See* U.S. Const. amend. V ("[P]rivate property [shall not] be taken for public use, without just compensation."); Cal. Const. art. 1,

§ 19 ("Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."). The Supreme Court recognizes that the Takings Clause of the Fifth Amendment is "self-executing" without statutory recognition, so "states [must] provide a specific remedy for takings in their own courts." *See Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 954 (9th Cir. 2008) (citing *First Eng. Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315 (1987)). Similarly, the California Constitution's takings provision is also self-executing without the need for more state legislation, meaning the State already indicated its consent to be sued when adequate payment to an owner did not follow a taking. *See Rose v. State*, 123 P.2d 505, 513 (Cal. 1942) ("[I]f no statute exists, liability still exists.").

Indeed, the California Parties as much as conceded they are not categorically immune from liability under California law and argue only that any suit against the State alleging an unconstitutional taking must be litigated in its own courts. Comm'n's Op. Br. at 53 n.21. But this is an argument about the forum for suit and not liability. To the extent they are invoking a third defense—a state law immunity-from-*suit* defense—we and other circuits have not recognized it. *See Lombardo*, 540 F.3d at 194; *see also Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 250–55 (5th Cir. 2005). Further, allowing the California Parties to assert a state law immunity-from-suit defense separate from Eleventh Amendment immunity would make the decision in *Katz* a dead letter. If that argument prevails, state legislation can easily end-run the deemed waiver of state sovereign immunity effected by the Bankruptcy Clause and recognized in *Katz*. Tellingly, *Katz*

27

never limited its reach to only Eleventh Amendment immunity. 546 U.S. at 378 ("In ratifying the Bankruptcy Clause, the [s]tates acquiesced in a subordination of *whatever sovereign immunity they might overwise have asserted.*" (emphasis added)); *id.* at 377 ("States agreed . . . not to assert *any sovereign immunity defense* they might have had." (emphasis added)).[16]

Thus the California Parties' assertion of substantive immunity from liability under state law also fails. Because we reject the asserted sovereign immunity defenses, we do not reach whether the Commission also waived its sovereign immunity defenses by filing a proof of claim in the Bankruptcy Court and whether that waiver can be attributed to the State.

\*   \*   \*   \*   \*

State sovereign immunity is a critical feature of the U.S. Constitution, but it is not absolute. When they ratified the Constitution, states waived their sovereign immunity defense in bankruptcy proceedings that further a bankruptcy court's exercise of its *in rem* jurisdiction. We have such a proceeding

---

[16] We do not go as far as holding that the substantive-immunity-from-liability defense is deemed waived in every proceeding where sovereign immunity is rejected under *Katz*. We hold off because the California Parties do not have immunity from liability here, and there may be potential daylight between the two defenses when applying *Katz* to a state-law cause of action. *See* Brubaker, *supra*, at 132 (describing potential complications with applying *Katz* to state-law causes of action).

here, which seeks a ruling on rights in the Debtors' property and will affect the distribution of assets to the Debtors' creditors. We affirm the District Court's affirmance of the Bankruptcy Court's ruling and reject the California Parties' assertion of sovereign immunity in the Adversary Proceeding.